In re **CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.**

**The LTV CORPORATION, for itself and on behalf of all affiliated debtors in these cases; the Official Committee of Unsecured Creditors of LTV Steel Company, Inc.; the Official Committee of Parent Creditors of the LTV Corporation; the Official Committee of Equity Security Holders; and the LTV Bank Group, Plaintiffs,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Defendant.**

Bankruptcy Nos. 86 B 11270 (BRL)—86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).
Adv. No. 89–6122A.

United States Bankruptcy Court, S.D. New York.

May 24, 1990.

Davis Polk & Wardwell by Lewis Kaden, Karen E. Wagner, Levin & Weintraub, Crames & Edelman by Michael J. Crames, Marc Abrams, New York City, LeBoeuf, Lamb, Leiby & MacRae, P.C. by Frank Cummings, Washington, D.C., for debtors/plaintiffs.

Pension Benefit Guar. Corp., Carol Connor Flowe by Jeanne K. Beck, William G. Beyer, Washington, D.C.

Cleary, Gottlieb, Steen & Hamilton by George Weisz, New York City, for PBGC.

Stroock & Stroock & Lavan, Wachtell, Lipton, Rosen & Katz by Harold S. Novikoff, New York City, for LTV Steel Creditors Committee/plaintiffs.

Blank, Rome, Cominsky & McCauley by William E. Taylor, III, Philadelphia, Pa., for Parent Creditors Committee/plaintiffs.

Kramer, Levin, Nessen, Kamin & Frankel by Michael J. Dell, New York City, for LTV Bank Group/plaintiffs.

Warshaw Burstein Cohen Schlesinger & Kuh by Edgar H. Booth, New York City, for Equity Committee/plaintiffs.

Winthrop, Stimson, Putnam & Roberts by Millard P. Darden, Jr., New York City, for First Fidelity, N.A.

## MEMORANDUM DECISION ON MOTION AND CROSS–MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Chief Judge.

(FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 28 U.S.C. § 157(c)(1) AND BANKRUPTCY RULE 9033)

This adversary proceeding is before this Court pursuant to a withdrawal of the reference and referral for findings and conclusions subject to *de novo* review in accordance with 28 U.S.C. § 157(c)(1) [1]. The dispute herein involves specified aspects of the status and priority of claims relating to certain terminated pension plans filed against the Debtors by the Pension Benefit Guaranty Corporation. These claims are by far the largest group of claims in these cases and their resolution will have a major impact upon the ultimate plan or plans of reorganization to be confirmed in these cases which are among the largest and most complex pending in the nation.

## BACKGROUND

The prior proceedings and essential facts relevant to a determination of the various issues presented are not in dispute and can be summarized as follows:

On July 17, 1986 (the "Filing Date") and thereafter, the LTV Corporation ("LTV") and sixty-six of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Since the Filing Date, the Debtors have been continued in the management and operation of their respective businesses and properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Code. The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to orders of this Court. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 cases.

The Debtors are a large and highly complex group of companies principally engaged in the steel, aerospace/defense and energy products industries. LTV Steel Company, Inc. ("LTV Steel") is a major producer of hot and cold rolled sheets for the automotive and consumer durable goods markets and has been a major producer of high quality bar products [2]. LTV Steel is one of the largest steelmakers in the United States as a result of LTV's June 29, 1984 acquisition of Republic Steel Corporation ("Republic Steel"), and the subsequent merger of J & L Steel, a former wholly-owned subsidiary of LTV, into Republic (the surviving corporation thereafter being renamed LTV Steel).

---

1. *In re Chateaugay Corp.,* 108 B.R. 27, 29 (S.D.N.Y.1989).

2. This Court approved Debtors' motion for the sale of its bar division in 1989.

The Pension Benefit Guaranty Corporation ("PBGC") is a wholly-owned United States government corporation established under Section 4002 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1302, to administer the pension plan termination program created under Title IV of ERISA. 29 U.S.C. §§ 1301–1461 (1982), as amended by the Single–Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99–272, 100 Stat. 237 (April 7, 1986) (codified at 29 U.S.C.A. §§ 1301–1461 (West Supp.1987)) ("SEPPAA").[3] Under ERISA, single-employer pension plans may be voluntarily terminated under certain circumstances by plan administrators under ERISA Section 4041, 29 U.S.C. § 1341. They also may be involuntarily terminated by the PBGC under ERISA Section 4042, 29 U.S.C. § 1342, for various reasons such as the employer's inability to adequately fund the benefit programs. The PBGC is required to guarantee payment of non-forfeitable benefits under terminated plans, subject to certain limitations. *See,* ERISA Sections 4022, 4022B, 4061, 29 U.S.C. §§ 1322, 1322b, 1361. To finance the payment of these benefits, the PBGC uses funding obtained from two sources: (1) the annual insurance premiums paid by the administrators of covered plans pursuant to Sections 4006 and 4007 of ERISA, 29 U.S.C. §§ 1306 and 1307; and (2) the employer liability payments collected under Section 4062 of ERISA, 29 U.S.C. § 1362, which makes employers whose plans terminate with insufficient assets liable to the PBGC for part of the terminated plan's unfunded guaranteed benefits, *see,* 29 U.S.C. § 1362(b). When a covered pension plan terminates without sufficient funds to pay benefits guaranteed under Title IV, the PBGC takes over the assets and liabilities of the plan, makes up the deficiency in plan assets, and pays benefits to plan participants.

At the time of the Filing Date, the Debtors were sponsors and LTV was the administrator of a number of pension plans which provided a variety of benefits for employees and retirees. The four largest plans were those of LTV Steel. The four plans included: (1) the Jones & Laughlin Hourly Pension Plan (the "J & L Hourly Plan"); (2) the Jones & Laughlin Retirement Plan (the "J & L Salaried Plan"); (3) the Pension Plan of Republic Steel Corporation Dated and Effective as of March 1, 1950 (the "Republic Hourly Plan"); and (4) the Republic Retirement Plan (the "Republic Salaried Plan").

After the Filing Date, the PBGC decided to terminate these four plans (collectively the "Terminated Plans"). Thus, on September 30, 1986, the PBGC moved in the United Stated District Court for the Southern District of New York (the "District Court") to terminate the Republic Salaried Plan under the involuntary termination provisions of Title IV of the ERISA. 29 U.S.C. §§ 1301–1461. On January 12, 1987, the PBGC moved in the District Court to terminate involuntarily the J & L Salaried Plan, the J & L Hourly Plan and the Republic Hourly Plan. As administrator of the plans, LTV consented to each of the terminations. The District Court entered the termination orders effective September 30, 1986 and January 13, 1987, respectively.

The PBGC subsequently attempted to restore administratively three of the Terminated Plans: the J & L Salaried Plan, the J & L Hourly Plan and the Republic Hourly Plan. The Debtors moved in this Court for an order declaring restoration to be in violation of § 362 of the Code. The District Court withdrew that action from this Court pursuant to the PBGC's motion under 28 U.S.C. § 157(d), and considered both actions together. *See, In re Chateaugay Corp.,* 86 B.R. 33 (S.D.N.Y.1987). On September 12, 1988, the District Court entered an order vacating the PBGC's Notice of Restoration, finding, *inter alia,* that the

---

**3.** On December 22, 1987, Congress amended Title IV of ERISA by enacting the Pension Protection Act (the "PPA") of 1987, Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330 (Dec. 22, 1987). Because the PPA antedated and thus does not apply to events that give rise to this litigation, the description of ERISA's statutory scheme as described herein does not reflect the 1987 amendments, and all citations to ERISA, as amended by SEPPAA, are to U.S.C. (Supp. 1987), except where expressly noted otherwise.

PBGC had acted in an arbitrary and capricious manner. *See, In re Chateaugay Corp.*, 87 B.R. 779 (S.D.N.Y.1988). On May 12, 1989, the United States Court of Appeals for the Second Circuit (the "Second Circuit") affirmed the District Court's decision. *See, PBGC v. LTV Corp.*, 875 F.2d 1008 (2d Cir.1989). On September 11, 1989, the PBGC filed a petition for writ of certiorari, which was granted by the Supreme Court on October 30, 1989. *See, PBGC v. LTV Corp.*, — U.S. —, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989). The Supreme Court heard oral argument on February 27, 1990 and the matter is currently *sub judice.*

On November 24, 1987, in accordance with this Court's bar order, the PBGC filed sixty-one proofs of claim under the caption "The LTV Corporation, et al., Case No. 86–B–11272," which were deemed filed in each of the Debtors' cases. Twenty-seven of the proofs of claim filed by the PBGC are based on the Terminated Plans. All Plaintiffs[4] have filed objections or adoptive pleadings with respect to the PBGC claims, and pursuant to this Court's "Case Management Order" all objections and/or pleadings have been consolidated into the adversary proceeding herein (the "Adversary Proceeding").

On September 8, 1989, the PBGC moved to withdraw the reference of this Adversary Proceeding to the District Court. The PBGC's motion to withdraw the reference was assigned to Judge Duffy, who granted the PBGC's request. Judge Duffy, however, acknowledged this Court's familiarity with the parties and issues in this Adversary Proceeding and consequently referred the proceeding to this Court for findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1), subject to *de novo* review by the District Court. *In re Chateaugay Corp.*, 108 B.R. at 29.

On November 21, 1989, the Plaintiffs filed their motion for partial summary judgment with respect to specified aspects of the status and priority of the PBGC claims relating to the Terminated Plans. On January 16, 1990, the PBGC crossed-moved for partial summary judgment with respect to certain issues raised by the Plaintiffs' objections and counterclaims to the PBGC's claims.

It should be noted that the PBGC previously sought a stay of the instant litigation pending the outcome of the restoration litigation currently before the Supreme Court[5]. The PBGC asserted that the issues raised herein may be mooted by the forthcoming Supreme Court's decision. Upon canvassing the issues presented in the cross-motions, this Court found that a resolution of the issues raised herein would complement whatever decision may be rendered by the Supreme Court and denied the PBGC's request so that these cases could go forward smoothly and expeditiously. The status and priority of the PBGC's claims are not expected to be implicated in any determination to be made by the Supreme Court. Indeed, Plaintiffs appear to have carefully drafted their motion for partial summary judgment in order to avoid such a conflict. Thus, no matter what the Supreme Court holds and/or remands, the issues raised in the cross-motions for partial summary judgment will have to be addressed, at least in terms of the Republic Salaried Plan, the one terminated plan which is not subject to the PBGC's restoration notice. Contrary to the prematurity and inconsequential stake arguments of PBGC's Counsel, the amount at issue, based solely on the Republic Salaried Plan which is not subject to the PBGC's restoration attempts, is far from *de minimis*[6], so that even if the PBGC prevails on its quest

---

4. Pursuant to this Court's "Case Management Order", dated October 4, 1989, the following parties have been joined as plaintiffs in this Adversary Proceeding: the Debtors, the Official Committee of Unsecured Creditors of LTV Steel, the Official Committee of Equity Security Holders, the Official Committee of Parent Creditors of LTV, and the LTV Bank Group (collectively, the "Plaintiffs").

5. *See,* Transcript dated December 12, 1989, of hearing involving the PBGC's Order To Show Cause to stay this Adversary Proceeding.

6. The aggregate amount of the claims filed by the PBGC involving the Republic Salaried Plan is in excess of a quarter of a billion dollars.

before the Supreme Court, the efforts of this Court and the parties in resolving these issues at this time will not have been squandered. However, the ultimate impact of a resolution of these issues here, on all of the Terminated Plans, will clearly have to await integration with the Supreme Court's decision.

## THE PBGC CLAIMS

Upon the termination of an insufficient plan, the plan's contributing sponsor and each member of its controlled group incur certain types of joint and several liability. The PBGC claims in this regard can be grouped into the following categories:

### A. *Plan Asset Insufficiency Claims*

The PBGC filed four proofs of claim in each case for plan asset insufficiency under ERISA Section 4062(b), 29 U.S.C. § 1362(b). The aggregate amount of the PBGC's filed claims for plan asset insufficiency is $2,232,211,237.00 (the "Insufficiency Claims").

The PBGC alleges that its Insufficiency Claims are entitled to lien status under ERISA Section 4068, 29 U.S.C. § 1368, asserting that liens, in the amounts of the asset insufficiency of each plan, arose on the termination dates of the plans pursuant to ERISA Section 4062(b)(1)(A), 29 U.S.C. § 1362(b)(1)(A). The PBGC asserts administrative status for these claims under § 503(b)(1) of the Code as claims which arose during the administration of these cases. The PBGC also asserts priority status for these Insufficiency Claims under § 507(a)(1) of the Code on the same basis. Alternatively, the PBGC claims a tax priority under § 507(a)(7) of the Code.

In contrast, the Plaintiffs assert that the alleged plan asset insufficiency of each plan includes the amount of such plan's claim for unpaid contribution as described in ¶ B below. Thus, the Plaintiffs contend that the claims for such unpaid contributions are duplicative of the Insufficiency Claims. The Plaintiffs also contest the PBGC's assertion that its claims are entitled to administrative status pursuant to §§ 503(b)(1), 507(a)(1) and 507(a)(7) of the Code.

### B. *Claims For Unpaid Contributions*

#### 1. Post–Petition Claims

The PBGC, acting as successor trustee of the Terminated Plans pursuant to ERISA Section 4042(b), filed four proofs of claim in each case under ERISA Section 4062(d), on behalf of the Terminated Plans for unpaid contributions allegedly owed to the Terminated Plans for the period from the Filing Date through the termination dates of the Terminated Plans. The aggregate amount asserted by the PBGC for these claims is $103,912,268.00, which the Plaintiffs assert is duplicative of amounts included in the Insufficiency Claims. The Plaintiffs also contest the PBGC's assertion that these claims are entitled to priority status pursuant to § 507(a)(1) of the Code.

#### 2. Pre–Petition Claims Entitled To Priority

The PBGC, acting as successor trustee of the Terminated Plans pursuant to ERISA Section 4042(b), filed four proofs of claim in each case under ERISA Section 4062(d), on behalf of the Terminated Plans for unpaid contributions allegedly owed to the Terminated Plans attributable to services rendered during the 180 days before the Filing Date. The PBGC asserts that these claims are entitled to priority status under § 507(a)(4) of the Code. The Plaintiffs contend that the aggregate amount of these claims, $107,399,974.00, is also included in the Insufficiency Claims, and therefore duplicative. The Plaintiffs further assert that any PBGC claims subject to § 507(a)(4) priority status are more than offset by payments made directly to the employees and beneficiaries pursuant to orders of this Court.

#### 3. Pre–Petition Claims Without Priority

The PBGC, acting as successor trustee of the Terminated Plans pursuant to ERISA Section 4042(b) filed four proofs of claim in each case under ERISA Section 4062(d), on behalf of the Terminated Plans for unpaid contributions allegedly owed to the Terminated Plans for the period prior to the

Filing Date. Plaintiffs contend that the aggregate amount claimed for these claims, $196,610,938.00, is also included in the Insufficiency Claims and, therefore duplicative.

### 4. Secured Status For Unpaid Contributions

The PBGC filed three proofs of claim in each case on behalf of the J & L Hourly Plan, the J & L Salaried Plan and the Republic Hourly Plan asserting secured status for allegedly unpaid contributions for plan year 1984. The claims relate to the security pledged as a condition for a waiver of the 1984 plan year contributions to the three plans. The PBGC alleges that LTV Steel subsequently defaulted on the waiver and that the claims are secured by the pledged collateral. The Internal Revenue Service revoked the waiver on November 12, 1986. The aggregate amount claimed is $239,342,000.00

### C. *Section 4049 Trust Claims*

The PBGC filed four proofs of claim in each case pursuant to ERISA Section 4062(c), for liabilities owed to a trust purportedly established with respect to the Terminated Plans pursuant to ERISA Sections 4042(i) and 4049, for the lesser of seventy-five percent of the total "outstanding amount of benefit commitments" under the Terminated Plans or fifteen percent of the actuarial present value as of the dates of termination of all "benefit commitments" under each terminated plan. The aggregate amount of these claims is $289,-944,000.00 (the "Section 4049 Trust Claims").

The Plaintiffs maintain that these claims are more than offset by payments made to retirees pursuant to an interim labor agreement entered into between LTV Steel and the United Steelworkers of America in 1987 and benefits implemented for salaried retirees at the same time. The Plaintiffs also contest the PBGC's assertion that these claims are entitled to priority status under §§ 503(b)(1)(A) and 507(a)(1) of the Code as liabilities which arose during the administration of the estates.

### D. *Contract Claims*

As trustee for the Terminated Plans, the PBGC filed four proofs of claim in each case allegedly based upon the agreements pursuant to which the Terminated Plans were established. These claims are unliquidated. The Plaintiffs, again, contest the PBGC's assertion of administrative priority status for these claims pursuant to §§ 503(b)(1)(A) and 507(a)(1) of the Code as claims which have arisen or will arise during the administration of the estate. The Plaintiffs also maintain that these claims are duplicative of the Insufficiency Claims and other claims and simply assert an alternative legal theory of recovery.

## SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable herein pursuant to Bankruptcy Rules 7056 and 9014, provides that a party seeking declaratory relief may move for summary judgment. Federal Rule 56(a). Summary judgment is appropriate where the movant demonstrates that there are no genuine issues of material fact to be tried and the court may decide issues as a matter of law. Federal Rule 56(c); *see, e.g., Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980); *In re O.P.M. Leasing Serv., Inc.*, 46 B.R. 661, 665 (Bankr.S.D.N.Y.1985). "On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988). *Accord, e.g., Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975); *Insurance Co. of N. Am. v. M/V Atl. Corona*, 704 F.Supp. 528, 529 (S.D.N.Y.1989). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The parties are in agreement that there are no genuine issues as to any material fact that would preclude this Court from addressing the questions raised herein as a matter of law. Although the cross-motions for partial summary judgment involve complex legal questions under both ERISA and the Code, they do not, however, involve any genuine issue of material fact under the substantive law governing the resolution of these issues. Therefore, in accordance with the mandate of the District Court, this Court makes the following conclusions of law pursuant to 28 U.S.C. § 157(c)(1), and grants Plaintiffs' motion for partial summary judgment. The PBGC's cross-motion for partial summary judgment is denied.

### ISSUES

1. Whether federal bankruptcy law, not ERISA, is determinative of the discount rate to be applied in calculating the PBGC claims.

2. Whether any of the PBGC's claims is entitled to administrative status.

3. Whether the PBGC's Insufficiency Claims are entitled to lien or tax status.

   A. Whether ERISA or the Bankruptcy Code allows lien status or priority for the PBGC claims.

   B. Whether Bankruptcy Code § 362 automatically stays the post-petition creation of lien.

4. Whether the PBGC's Insufficiency Claims should be disallowed to the extent that they exceed the seventy-five percent statutory limit or are duplicative of the PBGC's contribution claims.

5. Whether the PBGC's pre-petition contribution claims with § 507(a)(4) priority must be offset by payments made by the Debtors.

6. Whether the PBGC has any basis for asserting Section 4049 Trust Claims.

### DISCUSSION

1. Whether federal bankruptcy law, not ERISA, is determinative of the discount rate to be applied in calculating the PBGC claims.

The PBGC's employer liability claims are based upon the "underfunded guaranteed benefits" under the plan as of the assumed termination dates. ERISA Section 4062(B)(1), 29 U.S.C. § 1362(b)(1). The term "unfunded guaranteed benefits" is defined in ERISA Section 4001(a)(17) as the difference between the "actuarial present value" of guaranteed benefits, "determined as of [the termination date] on the basis of assumptions prescribed by the [PBGC]," and the current value of the plan's assets allocable to those benefits. 29 U.S.C. § 1301(a)(17). Pursuant to these statutory provisions, when an underfunded plan terminates, the PBGC is charged with determining the amount of unfunded guaranteed benefits under the plan. Under § 2619.43(a) of the Code of Federal Regulations, the PBGC is also charged with determining the present value of all future plan benefits when a plan is terminated, and applies a range of discount rates for the purpose of determining termination liability, dependent on when the plan will have to pay out benefits. (PBGC Notice of Proposed Rulemaking, 41 Fed.Reg. 48, 485–86 (Nov. 3, 1976)).

Although it is undisputed that ERISA entitles the PBGC to set the discount rate for determination of termination liability, the Plaintiffs assert that in the reorganization context this right must be subordinated to other policies. Plaintiffs argue that federal bankruptcy law requires that discount or interest rate assumptions used to determine the allowable amount of the PBGC's claims must be those realistically likely to result in the determination of the full economic value of the claim, rather than those serving other policy goals. Consequently, Plaintiffs seek judgment as a matter of law declaring that an economic, market discount rate, not the PBGC's preferentially selected rates, must be applied to determine the present value of LTV's gross liability to the PBGC. Once this determination is made as a matter of law, the actual discount rate to apply is a factual question to be left for another day. In contrast, the PBGC asserts that where the regulatory scheme is technical and complex, this Court should defer to the expertise of the agency

in determining the appropriate discount rate. The PBGC bases its assertion on non-bankruptcy Supreme Court case-law involving administration law which limits a court's inquiry as to whether the PBGC's interpretation is "permissible". *See, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984).

The statute in question does not define the term "actuarial present value of guaranteed benefits" or set forth any procedures or interest rate or other actuarial assumptions for the PBGC to follow in determining such benefits. Consequently the PBGC asserts that "if the statute is silent or ambiguous with respect to the specific issue," then the only remaining question for the court is "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782; *see also, Bridgestone/Firestone, Inc. v. PBGC*, 892 F.2d 105, 110–11 (D.C.Cir.1989). The PBGC states that its interest rates are set with the intent that—when combined with PBGC mortality assumptions—they will produce benefit values that are generally in line with the private insurance industry's annuity prices. (*See, Notice of Proposed Change in the Method for Setting Interest Rates and Factors*, 45 Fed.Reg. 38,415, 38,416 (PBGC, June 9, 1980)). The PBGC concludes that its determination of the applicable discount rate is "permissible".

■ The PBGC is basically advocating that it is entitled to promulgate and enforce, even in a bankruptcy case, regulations which violate fundamental bankruptcy provisions and principles, arguing that a government agency can by its own regulation set the discount rate for allowance of its claims under § 502(b) of the Code. However, based upon the Congressional mandate that there should be a fair and uniform distribution among creditors, this Court finds that the PBGC's claims must be valued in accordance with federal bankruptcy law standards applicable to all claims in reorganization cases. Conse-quently, the PBGC's claims must be recalculated.

Although ERISA entitles the PBGC under applicable administrative law restrictions to set the discount rate for determination of termination liability, in the reorganization context this right must be subordinated to other policies.

[T]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 [104 S.Ct. 1188, 79 L.Ed.2d 482] (1984) which stated "[t]he fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."

*In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176–77 (Bankr.S.D.N.Y.1989) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197); *see also, United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209–12, 103 S.Ct. 2309, 2315–17, 76 L.Ed.2d 515 (1983) (agency enforcement procedures which might otherwise be available are subject to the procedures of reorganization); *In re A & B Heating & Air Conditioning*, 823 F.2d 462, 465 (11th Cir.1987), *vacated on other grounds*, 486 U.S. 1002, 108 S.Ct. 1724, 100 L.Ed.2d 189 (1988) (where circumstances require, federal tax policy must be subordinated to reorganization procedures).

Although this case arose under ERISA, the competing policies of bankruptcy and labor law must also be accorded due weight. In fact, section 514(d) of ERISA, 29 U.S.C. § 1144(d), explicitly states that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States ... or any such law." *See also National Stabilization Agreement of the Sheet Metal Indus. Trust Fund v. Commercial Roofing & Sheet Metal*, 655 F.2d 1218, 1223 (D.C. Cir.1981), *cert. denied*, 455 U.S. 909, [102 S.Ct. 1256, 71 L.Ed.2d 447] (1982). Thus,

here the policies and goals of ERISA must be accommodated along with those of bankruptcy and labor law. *PBGC v. LTV Corp.*, 875 F.2d 1008, 1016 (2d Cir.1989) (citations omitted). *See also, In re Ionosphere Clubs, Inc.*, slip op. 89 Civ. 8250 (MBM) at 12, 1990 WL 5203 (January 24, 1990) ("the [Railway Labor Act] procedures here must yield to those prescribed by the Bankruptcy Code."), *reh'g denied*, (S.D.N.Y. April 24, 1990).

Federal bankruptcy law requires that discount or interest rate assumptions used to determine the allowable amount of claims must be those realistically likely to result in the determination of the full economic value of the claim, rather than those serving other policy goals. "Once an entity has been brought into the jurisdiction of the Bankruptcy Court, it is this Court's province to determine the interest rate". *In re Caudill*, 82 B.R. 969, 978 (Bankr.S.D.Ind. 1988). Clearly, "[t]he Bankruptcy Code controls the allowance of claims including those arising under ERISA." *In re Columbia Motor Express, Inc.*, 33 B.R. 389, 394 (M.D.Tenn.1983).

The PBGC, relying on *Chevron, supra*, argues that where, as here, the regulatory scheme is technical and complex, this Court should rely on the agency's expertise in the area. The PBGC further argues that the its interpretation in this instance rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by a reviewing court, and therefore should not be disturbed. *Id.* 467 U.S. at 845, 104 S.Ct. at 2783; *see also, Batterton v. Francis*, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). Thus, the PBGC asserts, based upon its highly technical expertise in prescribing actuarial assumptions for purposes of determining employer liability, as well as the PBGC's appreciation for the complexities of Title IV of ERISA, and its responsibility to carry out the policies and goals of the statute, that its determination of the discount rate should not be displaced. Finally, the PBGC quoting *In re Continental Airlines Corp.*, 57 B.R. 845 (Bankr.S.D. Tex.1985), argues that "[t]he Bankruptcy Court must determine the allowability of claims for both summary judgment and estimation purposes by applying the appropriate substantive law which would be applied in the non-bankruptcy context." *Id.* at 849.

The PBGC's assertions in this regard are unpersuasive. Bankruptcy courts are often and routinely called upon to determine the present value of projected future payments, the value of a claim payable over time, and the value of a recovery which is in the form of payments over time pursuant to a plan of reorganization. *See, e.g., In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1505 (9th Cir.1987); *United States v. Neal Pharmacal Co.*, 789 F.2d 1283, 1285–86 (8th Cir.1986); *In re Shannon*, 100 B.R. 913, 927 (S.D.Ohio 1989); *In re O.P.M. Leasing Serv., Inc.*, 79 B.R. 161, 167 (S.D. N.Y.1987); *In re O.P.M. Leasing Serv., Inc.*, 56 B.R. 678, 684–85 (Bankr.S.D.N.Y. 1986).

Basically, to determine the allowable amount of a claim payable over time, a two step process is necessary. As the PBGC states in its own brief "it is well-settled that the starting point for determining the amount of the debt underlying a claim is the substantive non-bankruptcy law that gives rise to the debt." *See*, Memorandum of PBGC at 17. Consequently, the gross value of the claim must first be determined by reference to the substantive law giving rise to the claim. *See, e.g., Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946); *In re American Reserve Corp.*, 840 F.2d 487, 489 (7th Cir.1988); *In re United Merchants and Mfrs. Inc.*, 674 F.2d 134, 141 (2d Cir.1982); *In re Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135–36 (3d Cir.1982); *In re Continental Airlines Corp.*, 57 B.R. at 849. The actuarial considerations identified by the PBGC, *i.e.*, mortality rates, valuation of additional accrued benefits, determination of expected retirement age and adjustment for benefits in excess of insurance limits, all address this first step—the determination of the face amount of the aggregate future liabilities of the terminated plans.

This is *perhaps* the area where the highly technical expertise of the PBGC in prescribing actuarial assumptions should not be disturbed[7]. However, the PBGC's expertise in this regard has no bearing on the present value calculation.

Once the value of the aggregate future liabilities has been determined, the present value of those future liabilities is determined as a matter of bankruptcy law so that all similar claims for future liabilities are treated in an economically similar manner. Thus, once it is determined that there is a valid obligation arising from non-bankruptcy law, the court will "still have to decide whether allowance of the claim would be compatible with the policy of the Bankruptcy Act". *Vanston*, 329 U.S. at 162, 67 S.Ct. at 240.

> While state law ordinarily determines what claims of creditors are valid and subsisting obligations, a bankruptcy court is entitled ... to determine how and what claims are allowable for bankruptcy purposes, in order to accomplish the statutory purpose of advancing a ratable distribution of assets among the creditors.

*In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir.1984). *See also, In re Shelter Enterprises, Inc.*, 98 B.R. 224, 229 (Bankr.W.D.Pa.1989) (the existence of a claim is determined by state law; the allowability of the claim is determined by bankruptcy law). The determination of the allowability of a claim includes the choice of an appropriate interest rate. *See e.g., In re Caudill*, 82 B.R. at 978. The determination of the allowability of ERISA claims is not exempted from this general rule. *See, In re Columbia Motor Express, Inc.*, 33 B.R. at 394.

The PBGC's suggestion that its calculation of its claims was an agency determination that can only be reviewed by this Court pursuant to the standards for review of agency action is without merit. The determination of an appropriate discount rate, and its application to the liability here, is hardly a matter of ERISA expertise. On the contrary, this Court, and bankruptcy courts generally, have vast experience determining the present value of claims which involve payments over many years. Therefore, the PBGC's reliance upon *Chevron, supra*, and *Bridgestone/Firestone, Inc. v. PBGC, supra*, is wholly misplaced.

Additionally, allowance of the agency's claim based on its chosen below-market discount rate would effectively allow the agency a claim for unmatured interest to the extent its rate is below market, in violation of § 502(b)(2)[8]. *See*, H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352–353 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 62 (1978), U.S.Code Cong. & Admin. News 1978, at 5747, 5848, 6308–09. *See also, In re Chateaugay Corp.*, 109 B.R. 51 (Bankr.S.D.N.Y.1990), *appeal pending* (S.D.N.Y.); *In re Allegheny International, Inc.*, 100 B.R. 247 (Bankr.W.D.Pa.1989), *appeal pending*, No. 89–1781 (W.D.Pa.). Were the PBGC correct in its assertion that a discount rate enforceable under otherwise applicable non-bankruptcy law governs allowance of claims in bankruptcy cases, bankruptcy courts would be required to value all claims for future payments based on whatever discount rate the government agency, or even a private party, might specify by regulation or contract, undermining the bedrock principle of equality of distribution to unsecured creditors.

The Sixth Circuit has articulated that the objectives of Title IV of ERISA are as follows:

> The purposes of Title IV are stated expressly in § 1302(a): 1) to encourage the operation and continuation of private pension plans; 2) to protect employees' pension benefits; and 3) to keep the insurance premiums paid to the PBGC as low as possible. In addition, the legislative history demonstrates the Congres-

---

**7.** Plaintiffs do not concede that the actuarial calculations in this regard are accurate, but only that the appropriateness of the PBGC's assumptions in generating these claims are not currently at issue in their motion for partial summary judgment.

**8.** Section 502(b)(2) of the Code provides that the court shall determine the claim "except to the extent that ... (2) such claim is for unmatured interest." 11 U.S.C. § 502(b)(2).

sional purpose of imposing employer liability in order to prevent employers from abusing the termination insurance program by shifting their financial burdens under pension plans to the PBGC or by making unrealistic promises to employees. (citations omitted).

*A–T–O, Inc. v. Pension Benefit Guaranty Corp.*, 634 F.2d 1013, 1035 (6th Cir.1980); *See*, H.R.Rep. No. 99–300, 99th Cong.Sess. 278 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 42,929; *See also, In re Resol Mfg. Co., Inc.*, 110 B.R. 858, 861 (Bankr.N.D.Ill.1990). Thus, based on its charter, the PBGC is clearly motivated to enhance its claims in these cases as much as possible. Dramatically, each one percent decrease in the discount rate increases the PBGC's aggregate claims by as much as $250 million. Whether or not the PBGC's application of the low rate used is permissible outside the bankruptcy context, the use of such a rate to enhance the claims of a single creditor is inappropriate where an employer and its controlled group are debtors in bankruptcy, and where Congress and the courts have mandated fair and uniform distribution among creditors. A party asserting a claim against the estate should not be permitted to have so much discretion and input as to how to obtain the highest yield on its own claim.

Although the Plaintiffs assert that the appropriate discount rate of return should be, or should be related to, the PBGC's historical rate of return on assets, in this motion the Plaintiffs do not seek a determination of the appropriate discount rate to be applied to the PBGC's claims. Rather, Plaintiffs seek a determination that the rate used be determined pursuant to bankruptcy principles and not pursuant to regulatory fiat.

In accordance with the foregoing, this Court concludes that the present value of the claims must be determined in accordance with federal bankruptcy law concepts as to which applicable discount rate governs the aggregate periodic liabilities to plan beneficiaries over the period during which such payments will be due.

2. Whether any of the PBGC's claims is entitled to administrative status.

The PBGC has asserted that its Insufficiency Claims, Section 4049 Trust Claims, contract claims, and certain of its unpaid contribution claims are entitled to administrative priority as "actual, necessary costs and expenses of preserving the estate" within the meaning of § 503(b)(1)(A) of the Code.

Section 507 of the Code defines the expenses and claims against a debtor's estate that are entitled to priority. Section 507(a)(1) gives first priority to administrative expenses allowed under § 503(b) of the Code, which include claims for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case". 11 U.S.C. § 503(b)(1)(A). However, a court is not strictly limited to the specific examples of claims explicitly set forth in § 503(b) as giving rise to an administrative expense. As stated in 3 *Collier On Bankruptcy:*

> While it is true that the court is not free to fashion additional priorities it ought not be assumed that the six designations are necessarily exclusive nor designed to cover every conceivable situation. The use of the word "including" as the last word in the lead-in sentence of section 503(b), in accordance with section 102(3), is not limiting. Section 102(3) states that the words "includes" and "including" are not limiting. A court might well conclude that there are to be allowed as administrative expenses claims not necessarily precisely covered by the provisions of section 503(b).... Further, what constitute actual and necessary costs and expenses of preserving an estate might well be open to judicial construction.

*Id.* ¶ 503.03 at 503–17 (15 ed. 1989).

It is well-established in this Circuit that priorities are to be narrowly construed, and that " '[i]f one claimant is to be preferred over others, the purpose should be clear from the statute.' " *Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir.1986) (quoting *Nathanson v. NLRB*, 344 U.S. 25, 29, 73

S.Ct. 80, 83, 97 L.Ed. 23 (1952)). *See also, In re Chateaugay Corp.*, 102 B.R. 335, 353 (Bankr.S.D.N.Y.1989), *aff'd*, (S.D.N.Y. March 29, 1990); *In re United Merchants & Mfrs., Inc.*, 597 F.2d 348, 349 (2d Cir. 1979); *In re United Dept. Stores, Inc.*, 49 B.R. 462, 465 (Bankr.S.D.N.Y.1985); *In re Amfesco Indus., Inc.*, 81 B.R. 777, 785–86 (Bankr.E.D.N.Y.1988); *In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976). A bankruptcy court is without discretion or authority to deviate from the Code's narrow list of priorities on purely equitable grounds. *In re Lockwood Enters., Inc.*, 54 B.R. 829, 832 (Bankr.S.D.N.Y.1985); *see, generally, In re Amfesco Indus., Inc.*, 81 B.R. at 785; *In re Baldwin–United Corp.*, 43 B.R. 443, 456–57 (Bankr. S.D.Ohio 1984). Additionally, it is clear that the burden of establishing entitlement to priority rests with the claimant and "should only be granted under extraordinary circumstances, to wit, when the parties seeking priority have sustained their burden of demonstrating that their services are actual and necessary to preserve the estate." *In re Amfesco Indus., Inc.*, 81 B.R. at 785; *see, In re Chateaugay Corp.*, 102 B.R. at 353; *In re O.P.M. Leasing Serv., Inc.*, 60 B.R. 679, 680 (Bankr.S.D.N.Y.1986).

■ "The criteria for determining whether a claim qualifies for administrative priority are set forth in *In re Mammoth Mart, Inc.*, 536 F.2d at 950, a seminal case decided under the former Bankruptcy Act but equally applicable under the Code." *In re Chateaugay Corp.*, 102 B.R. at 353. The court in *Mammoth Mart* held that in order to be entitled to administrative priority, a claimant must demonstrate that the obligation in question (i) arose from a transaction with the debtor-in-possession and (ii) resulted in a direct benefit to the estate. *In re Mammoth Mart, Inc.*, 536 F.2d at 954. *See, In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir.1984); *Trustees of Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d at 101; *In re Chateaugay Corp.*, 102 B.R. at 353; *In re Baths Int'l, Inc.*, 25 B.R. 538 (S.D.N.Y.1982), *aff'd*, 31 B.R. 143, 145 (S.D.N.Y.1983). This test is premised upon two fundamental policies underlying federal bankruptcy law, equality of distribution and rehabilitation of the debtor's business. *In re Chateaugay Corp.*, 102 B.R. at 354.

The parties agree that the aforementioned standards govern the dispute herein, however, they disagree as to their applicability in these circumstances. Plaintiffs argue that the PBGC's claims arose from pre-petition transactions and that they do not directly benefit any of the Debtors in the operation of their businesses. In contrast, the PBGC argues that termination occurred after the bankruptcy filing and that termination clearly benefits the Debtors in the operation of their business. In this regard, the PBGC relies on the Debtors' admission that "one of the principal goals of the filing of LTV's and LTV Steel's Chapter 11 petitions was the restructuring of LTV Steel's pension obligations." *In re Chateaugay Corp. (PBGC v. LTV)*, 87 B.R. 779, 816 (S.D.N.Y.1988). The PBGC asserts that this could happen only if the plans were terminated with the PBGC assuming responsibility for the unfunded liabilities, and new pension arrangements could be negotiated. Consequently, the PBGC maintains that following termination the Debtors-in-possession benefitted because: (i) the estates incurred no further liability for benefits accruals or vesting; (ii) the statutory obligation to make minimum funding contributions under ERISA Section 302, 29 U.S.C. § 1082 and Internal Revenue Code § 412, 26 U.S.C. § 412, ceased; and (iii) in exchange for employer liability, the PBGC assumed LTV's enormous unfunded obligation to plan participants.

■ This Court finds that the PBGC's claims cannot meet either part of the *Mammoth Mart* test because the PBGC's claims arose from pre-petition transactions, and not from a transaction with the Debtors-in-possession; and there was no resulting direct benefit to any of the Debtors in the operation of their businesses.

The threshold issue which must be addressed is whether the PBGC's claims arose from a transaction with the Debtors-

in-possession upon termination of the pension plans. The PBGC asserts that its claims arose at the time of termination in a transaction with the Debtors-in-possession because the claims became "due and payable" at that time. Implicit in the PBGC's argument is a revisiting of an issue which has previously been addressed by the District Court. *See, In re Chateaugay Corp.,* 87 B.R. 779, 794-99 (S.D.N.Y.1988), *aff'd sub nom. PBGC v. LTV Corp.,* 875 F.2d 1008 (2d Cir.), *cert. granted,* — U.S. —, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989). Indeed, when the District Court was confronted with, *inter alia,* the issue of whether the purported restoration of certain of the Debtors' pension plans by the PBGC was legally effective and whether the PBGC had pre-petition or post-petition claims, Judge Sweet found as follows:

> Consistent with the goals of uniform treatment for creditors and a fresh start for debtors, courts have determined when a claim arises for Code purposes by focusing upon "the time when the acts giving rise to the alleged liability were performed," since only reference to pre-petition acts of the debtor will result in treating liabilities flowing from such acts in an equitable fashion.

*Id.* at 796 (quoting *In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y. 1986)); *accord Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 202 (4th Cir.1988), *cert. dismissed sub nom., Joynes v. A.H. Robins Co., Inc.,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *In re Edge,* 60 B.R. 690, 699 (Bankr.M.D.Tenn.1986).

Moreover, the District Court held that the time when a claim arises is determined by bankruptcy law in the absence of an overriding non-bankruptcy federal policy or interest. *In re Chateaugay Corp.,* 87 B.R. at 799. The District Court concluded as follows:

> The PBGC has not offered a compelling reason why the post-petition termination of a pension plan should displace the actual service of employee-beneficiaries as the "acts" that give rise to a sponsor's pension liabilities. Based upon the foregoing consideration of the policies of the Code and of ERISA, the objectives of the

> Code will be furthered and those of ERISA not frustrated if LTV's pension liabilities to the PBGC are treated as prepetition claims.

*In re Chateaugay Corp.,* 87 B.R. at 799.

The PBGC contends that Judge Sweet's decision in this regard is merely *dictum* because this issue was neither properly before him nor essential to the outcome of the other matters in question. Plaintiffs, on the other hand, vehemently dispute the PBGC's characterization of the District Courts' opinion on this issue as *dictum.* Nevertheless, assuming, *arguendo,* that the PBGC's contention is correct, this Court's examination of this issue, *de novo,* still brings about an identical result.

Pursuant to § 1141(d)(1)(A) of the Code, and as a major departure from the since repealed Bankruptcy Act, the confirmation of a debtor's plan of reorganization discharges the debtor "from any debt that arose before the date of ... confirmation...." Section 101(11) of the Code defines "debt" as a "liability on a claim." Moreover, § 1141(c) of the Code provides that, upon confirmation, "the property dealt with by the plan is free and clear of all claims and interests of creditors...."

As stated by this Court in *In re Johns–Manville Corp., supra,* "[a] 'claim' is broadly defined by § 101(4)(A) as 'a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.'" *Id.* 57 B.R. at 686. The legislative history to § 101(4) demonstrates that the term "claim" is intended by this definition to be as broadly interpreted as possible so that maximum relief can be afforded to a debtor:

> The effect of the definition [of claim] is a significant departure from present law [*i.e.,* the Act].... The definition.... adopts an even broader definition of claims than is found in the present debtor rehabilitation chapters [*i.e.,* Chapters X, XI, and XII]. The definition is any right to payment, whether or not reduced

to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment. By this broadest possible definition ... [the Bankruptcy Code] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 595, 95th Cong., 2nd Sess. 309, *reprinted in* 1977 U.S.Code Cong. & Admin.News 5963, 6266; *see also*, S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5807–08.

Consistent with the Code's objectives of providing a fresh start for debtors and treating creditors fairly and equitably, courts have held that the appropriate focus for determining when a claim arises is at "the time when the acts giving rise to the alleged liability were performed" since only reference to prepetition acts of the debtor will result in the equitable treatment of liabilities flowing from such acts. *In re Johns–Manville Corp.*, 57 B.R. at 688; *see also, In re Chateaugay Corp.*, 102 B.R. at 351; *In re Revere Copper & Brass, Inc.*, 29 B.R. 584, 588 (Bankr.S.D.N.Y.), *aff'd*, 32 B.R. 725 (S.D.N.Y.1983).

In these very same Chapter 11 cases, the issue as to whether a creditor is entitled to administrative status has arisen in several different contexts. For example, in another District Court decision, *In re Chateaugay Corp.*, 112 B.R. 513 (S.D.N.Y.1990), Judge Sprizzo categorized the cases which usually arise in this context as involving either

(1) a contractual relationship between the debtor and those who might or might not sue him in the future based upon future events within the reasonable ambit of that contractual relationship; or (2) the commission of a tort by the debtor that could lead to some future injury and a consequent decision of the injured par-

ty to seek legal redress against the debtor.

*Id.* at 520. The District Court, noting that although ERISA claims would fall within the first category, found that the liabilities imposed by the environmental statutes at issue did not fit neatly within those parameters. The court rejected the government's argument that "any cause of action fully arises only after a review has been made, a remedy chosen, and costs incurred" (*id.* at 522.) and found that it was irrelevant when the claim for relief "may be in all respects ripe for adjudication". *Id.* at 522. Instead, Judge Sprizzo focused on whether there had been a pre-petition triggering event in determining whether a claim arose pre- or post-petition. *Id.* at 521–22. *See also, In re Chateaugay Corp.*, 102 B.R. at 351 (this Court held that claims arising from pre-petition tax benefit transfer agreements are pre-petition in nature and not entitled to an administrative priority based upon a post-petition disqualifying event).

Consequently, in this situation, although the administrative action did not occur until post-petition, the so-called "triggering event" is not the termination of the plans by the PBGC, but rather the pre-petition labor of LTV Steel's employees. "Where the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as giving rise to a prepetition liability where the contract was executed prepetition." *In re Chateaugay Corp.*, 87 B.R. at 796. *See also, NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *In re Chateaugay Corp.*, 102 B.R. at 351; *In re William H. Herr, Inc.*, 61 B.R. 252, 253 (Bankr.E.D.Pa.1986); *In re Ahrens*, 64 B.R. 5, 6–7 (Bankr.E.D.Pa.1986).

The PBGC mistakenly asserts that since LTV was a debtor-in-possession at the time of termination and because the estate benefited as a result of termination of the pension plans due to the cessation of accrual of additional pension liability, the termination claims arise from beneficial transactions with the debtor-in-possession, and therefore, must be characterized as administrative. Although the PBGC contends that its position is not a *Frenville* type argument,

(*see, In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985)), it is clear that the PBGC's analysis is virtually identical to the *Frenville* analysis which has been discredited and rejected by this Court as well as many others[9] including the Circuit which gave it birth[10].

In *Frenville*, the Third Circuit held that a claim for contribution or indemnification arose under state law, not when the claimant provided pre-petition services to the debtor, but post-petition, when the claimant paid a judgment and accrued a right to seek payment. The court then concluded that state law controlled the determination of when the claim arose, *id.* at 337, refusing to find that the clear Congressional intent served by the breadth of the term "claim" in the Code should prevail over state law. *See, In re Chateaugay Corp.*, 102 B.R. at 352.

This Court again rejects the *Frenville* analysis "because it ignores congressional intent to define 'claim' broadly ... [and] [t]o that extent it distorts the underlying policies of the Code in equating a claim with a cause of action for indemnity or contribution under state law notwithstanding the clear pre-petition rooting of the right to payment being sought." *In re Johns–Manville,* 57 B.R. at 690; *see also, In re Chateaugay Corp.,* 102 B.R. at 352. In this case, the pension benefits were provided to and accrued by employees of LTV Steel for labor performed, for the most part, prior to the Filing Date. Consequently, any claims arising from LTV Steel's obligation to pay into the pension fund

plans are pre-petition debts. The PBGC held a contingent claim against LTV from the time that the pre-petition labor of LTV Steel's employees caused the accrual of claims by them for pension benefits. *PBGC v. LTV Corp.,* 875 F.2d at 1019; *In re Chateaugay Corp.,* 87 B.R. at 797.

A contingent claim has been described as one in which "the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created." *In re Chateaugay Corp., supra,* at 520 (quoting *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981)); *accord In re Crescenzi,* 53 B.R. 374, 380 (Bankr.S.D.N. Y.1985), *aff'd,* 69 B.R. 64 (S.D.N.Y.1986). The PBGC's right to payment upon termination was, on the petition date, a classic pre-petition contingent claim. The post-petition termination of the pension plans did not transform the PBGC's contingent pre-petition claims into post-petition claims. Consequently, the PBGC's *Frenville* type argument is without merit.

Moreover, the PBGC's pre-petition claims do not achieve administrative status as "actual and necessary" expenses of preserving the estate. None of the Debtors induced retirees to provide services post-petition by promising these pension benefits. Indeed, the bulk of the benefit claims from which the PBGC's termination claims derive, stem from obligations to retirees, originating long before the Filing Date. *Cf.* 131 Cong.

---

**9.** *See, In re Baldwin–United Corp. Litigation,* 765 F.2d 343, 348 n. 4 (2d Cir.1985) ("We are not [certain] that, if we reached the issue, we would follow *Frenville* and hold the stay inapplicable to [the] third-party complaint [at issue]. The broad definition of 'claim' in the Bankruptcy Code, a 'right to payment, whether or not such right is liquidated ... contingent ... unmatured,' 11 U.S.C. § 101(4)(A), creates a substantial question whether the stay applies to third-party complaint."); *In re Chateaugay Corp.,* 87 B.R. at 796 (noting "widespread bankruptcy court disapproval of *Frenville* "); *In re Chateaugay Corp.,* 102 B.R. at 352 n. 12 (noting that "the *Frenville* decision has been subject to substantial criticism"); *See also, In re Johns–Manville Corp.,* 57 B.R. at 688; *In re Johns–Manville Corp.,* 68

B.R. 618, 628–29 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987); *Grady v. A.H. Robins Co.,* 839 F.2d at 201; *In re Amfesco Indus., Inc.,* 81 B.R. 777, 782–83 (Bankr.E.D.N.Y.1988); *In re Yanks,* 49 B.R. 56, 58 (Bankr.S.D.Fla.1985); *In re Baldwin–United Corp.,* 48 B.R. 901, 902 (Bankr.S.D.Ohio 1985).

**10.** In *In re Remington Rand Corp.,* 836 F.2d 825 (3d Cir.1988), the Third Circuit distinguished its earlier opinion by stating: "Although we determined that state law governed the right to payment inquiry in *Frenville,* we acknowledged that in some cases, overlapping federal policy would require us to consult federal law." *Id.* at 830.

Rec.S. 17965 (Statement of Sen. Deconcini) ("termination during the pendency of a bankruptcy proceeding does not create any administrative expense priority").

In a case which both sides rely, *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984), the court was called on to determine whether an advertising agency's claims arising from its pre-petition placement of the debtor's telephone directory advertisements were entitled to administrative priority under § 503 of the Code when the advertisements were published following the debtor's Chapter 11 filing. Relying upon *Mammoth Mart's* two-part administrative priority test, the court held that the publication costs associated with the debtor's advertisements could not constitute a post-petition administrative claim notwithstanding the fact that the advertisements were published post-petition and benefited the debtor-in-possession. In reaching this conclusion, the court stated:

> We recognize that the services performed by appellants after the closing date, and after the filing of the petition, were significant and of value to Jartran. However, appellants do not allege that Jartran, after the filing of the petition, requested that appellants continue work on ads for which the closing date had passed.... Thus, it was the pre-petition Jartran and not Jartran as debtor-in-possession that *induced* appellants to perform these services. To serve the policy of priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority....

*In re Jartran, Inc.*, 732 F.2d at 587 (emphasis in original). Thus, the court clearly rejected the proposition that the post-petition triggering of the liability incurred by the pre-petition debtor entity could elevate a pre-petition claim to a post-petition administrative priority claim. *Id.* at 587–88; *accord, In re Chateaugay Corp.*, 102 B.R. at 355; *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d at 101 (holding that a "debt is not entitled to priority simply because the right to payment arises after the debtor in possession

has begun managing the estate."); *In re Chateaugay Corp.*, 87 B.R. at 797–99.

Similarly, here, the PBGC's claims, except for a small portion attributable to post-petition service of LTV Steel's employees, are not entitled to administrative status. Instead, these services arise from obligations incurred by LTV Steel prior to the Filing Date, not by LTV Steel as a debtor-in-possession. Nor is there any other credible argument that the unpaid contribution claims are "actual and necessary" expenses of preserving the estates. The PBGC has no legal basis for arguing that its claims should have a priority status which is not available to the retirees whose labor generated the obligations to the pension plans established to pay them.

Numerous courts have found that the nature of pension liability is determined by whether pension benefits were accrued pre- or post-petition.

> [A]ny post-petition funding obligation which may have existed under the ERISA minimum funding standards did not confer a benefit upon the Debtor's estate.... [Such obligations] are largely attributable to amortization expenses for employee pension credits earned in performing pre-petition services.... Denial of priority status to [the claim] comports with the careful structuring of priorities in the Bankruptcy Code.... Congress has expressly provided fourth priority status for employee benefit contributions in 11 U.S.C. § 507(a)(4). The PBGC, as Plan Trustee, here seeks first priority for pension contributions with no express priority grant in the Bankruptcy Code. To hold in favor of the PBGC and grant a first priority would, in effect, eliminate monies otherwise available to general creditors. Such a result is inconsistent with the priorities hierarchy provided by Congress in 11 U.S.C. § 507.

*In re Airlift Int'l Inc.*, No. 81–00846–BKC–SMW, slip op. at 6–10 (Bankr.S.D.Fla. July 23, 1985).

Courts have consistently rejected the argument that analogous withdrawal liability (as opposed to employer termination liability) under ERISA with respect to multiem-

ployer pension plans is entitled to priority as administrative expense incurred to preserve the estate. For example, in *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc., supra,* the Second Circuit determined that since the employer's lump sum payment in satisfaction of its withdrawal liability was made to guarantee pension benefits already earned by the employees covered by the plan, the consideration supporting the withdrawal liability was the same as that supporting the pensions themselves, *i.e.,* the past, pre-petition labor of the employees covered by the plan. *Id.* 789 F.2d at 101–03. Therefore, withdrawal liability with respect to post-petition termination of a multiemployer plan was based upon vested benefits relating to pre-petition services and was not "incurred for the benefit of the estate's creditors," *id.* at 104, giving rise only to a general unsecured claim. *Id.* at 100, 105. Withdrawal liability is

> merely a substitute for the continuing contributions a withdrawing employer would otherwise make toward fully funding vested benefits. [The debtor's] liability for its share of ... unfunded vested benefits existed long before the start of the Chapter 11 proceeding. Thus, withdrawal liability is not a cost of business activity occurring during the Chapter 11 proceeding.

*In re Kessler,* (*Amalgamated Ins. Fund v. Kessler, Inc.*), 55 B.R. 735, 740 (S.D.N.Y. 1985). *See also, In re United Dept. Stores, Inc.,* 49 B.R. at 465–66; *In re Kessler, Inc.,* 23 B.R. 722, 723–26 (Bankr.S.D. N.Y.1982), *aff'd,* 55 B.R. 735 (S.D.N.Y. 1985); *In re Great N.E. Lumber & Millwork Corp.,* 64 B.R. 426 (Bankr.E.D.Pa. 1986); *In re Silver Wheel Freightlines, Inc.,* 57 B.R. 476 (Bankr.D.Or.1985).

The PBGC mistakenly asserts that these "withdrawal liability" cases are inapposite to the instant dispute because withdrawal liability is different from termination liability. However, any difference between the two constitutes no relevant distinction with respect to the time the liability arises. The PBGC also claims that *In re Pulaski Highway Express, Inc.,* 57 B.R. 502, 509 (Bankr. M.D.Tenn.1986) and *In re Cott Corp.,* 47

B.R. 487, 491–92 (Bankr.D.Conn.1984) establish that "at least a part" of its Insufficiency Claims are entitled to administrative status. These two cases simply hold that the claims based upon benefits earned pursuant to post-petition employment are entitled to administrative priority. The Plaintiffs do not contest this point.

Moreover, this Court is not persuaded by the decision in *Columbia Packing Co. v. PBGC,* 81 B.R. 205 (D.Mass.1988), in which the court addressed the priority status of the PBGC's due and unpaid contribution claims and concluded that (1) the statutory funding obligations attributable to the post-petition period represented an expense entitled to administrative priority and (2) the entire post-petition obligation, including the past service liability cost, was incurred after the filing date and was therefore entitled to administrative status. *Id.* at 207–09. Accordingly, the court held that "the amount of an employer's contribution that is payable under [§ 507(a)(1) of the Code] is the amount of the standard funding account deficiency that accrues, on a daily basis, during the priority period, which is adjusted to reflect the true normal cost chargeable to the funding account during that period." *Id.* at 210. However, the *Columbia Packing* decision cannot be reconciled with the Second Circuit's holding in *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., supra,* which as stated previously, established that the resolution of the administrative priority issue essentially turns on when the debtor's employees provided labor in consideration for receiving pension benefits from the debtor. *Id.* 789 F.2d at 101–03.

Indeed, an unreported case which the PBGC attaches to its memorandum of law, *In re Bollinger Corp.,* No. 76–282, slip op. (Bankr.W.D.Pa. Jan. 30, 1981) supports the Plaintiffs' position that administrative expense priority should be denied for termination liability arising from a post-petition termination. Although the *Bollinger* case was decided under the Bankruptcy Act, its reasoning applies with equal force in the Code context. There, the court held:

> It is clear ... that the substantive deficiencies in assets represented by [the ter-

mination liability claims] were attributable to events prior to the filing and had these deficiencies been recognized just one day prior to the Plan [the termination liability claims] would rise no higher than § 64(a)(4) [tax priority] of the Bankruptcy Act. *It would create mischief to provide § 64(a)(1) [administrative expense] status to such · claims ahead of pre-bankruptcy wage claims which are given § 64(a)(2) status. It would do violence to the Bankruptcy Act to allow a creditor's claim to be improved by the filing of the petition.* *Id.* at 3 (emphasis added by the PBGC).

Additionally, a principal purpose of any reorganization is to restructure liabilities. If every liability limited or interdicted by a Chapter 11 filing became administrative by some discretionarily timed activity, the ability of a debtor to reorganize would be a fiction. It is a fact of bankruptcy life that the suspension of all pre-petition rooted payment obligations invariably benefits the debtor in the operation of its business. This can hardly be equated to the direct benefit contemplated by *Mammoth Mart* and the progeny of case-law which followed. Under the PBGC's novel approach to bankruptcy law, every suspended debt would qualify under § 503(b)(1)(A) for administrative status and every rejection of a burdensome pre-petition executory contract would give rise to an administrative claim as a transaction with the debtor-in-possession from which the estate derived a benefit.

Based on the foregoing discussion, this Court finds that the post-petition termination of the pension plans did not give rise to post-petition claims. Nor are the PBGC claims, except for a small portion attributable to post-petition services of LTV Steel's employees, entitled to administrative priority pursuant to § 503(b)(1)(A). Consequently, the PBGC's claims are therefore properly classified as general unsecured claims.

3. Whether the PBGC's Insufficiency Claims are entitled to lien or tax status.

The PBGC contends that its Insufficiency Claims are entitled to tax priority under § 507(a)(7) of the Code or lien status pursuant to ERISA Section 4068, 29 U.S.C. § 1368. The PBGC states that the statutory liens arose as a matter of law as of the date the plans were terminated. The PBGC bases its argument on fundamental statutory construction rules and states that if this Court were to follow the logic of the Plaintiffs in this instance other subsections of ERISA Section 4068 would become inoperative and therefore such a construction would be contrary to the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). The PBGC also relies on the Congressional record at various hearings after the Code was amended. Additionally, the PBGC relies on the fact that since under the Bankruptcy Act it was clearly entitled to tax status and since upon changing the Code other areas of ERISA were amended to comport with bankruptcy changes, the fact that there was no change to ERISA Section 4068 indicates the intent of Congress to leave the status quo on this issue. Finally, the PBGC states that the employer liability arises if and only if a pension plan terminates and thus the obligation is a "one-time tax" that the employer must pay for termination of an underfunded plan.

In contrast, Plaintiffs contend that neither ERISA nor the Code provides for treatment of these claims as liens if, as here, no lien arose or could have arisen prior to the filing of the bankruptcy petitions. The Plaintiffs assert that no lien has been recorded or otherwise perfected by the PBGC. Moreover, the Plaintiffs maintain that the creation of, and any attempt to record or perfect, such a lien would have been void *ab initio* as a violation of the automatic stay of § 362 of the Code. Plaintiffs also assert that such a lien would be voidable under § 545 of the Code. Consequently, Plaintiffs state that the PBGC's Insufficiency Claims must therefore be reclassified as general unsecured claims.

*A. Whether ERISA or the Bankruptcy Code allows lien status or priority for the PBGC's claims.*

■ The PBGC's assertion of tax priority status for its Insufficiency Claims is based upon ERISA Section 4068(c)(2), 29 U.S.C. § 1368(c)(2) which provides that in a bankruptcy proceeding, "the lien imposed under [ERISA Section 4068(a)] shall be treated in the same manner as a tax due and owing to the United States." Section 507(a)(7) provides: "[t]he following expenses and claims have priority in the following order ... (7)(A) a tax...."

The Plaintiffs argue that ERISA does not provide for tax treatment of a *claim*, but only for tax treatment of a *lien*. Consequently since no lien was or could have been created, the *claim* does not rise to the status of a tax claim. A lien arises under ERISA Section 4068(a), 29 U.S.C. § 1368(a), which provides:

> If any person [contributing sponsor or affiliate] liable to the [PBGC] under section 4062 ... neglects or refuses to pay, after demand, the amount of such liability to the extent of an amount equal to the unpaid amount described in section 4062(b)(1)(A)(i) [the 30% net worth portion of the PBGC claim] (including interest), there shall be a lien in favor of the corporation [the PBGC] to the extent of an amount equal to the unpaid amount described in section 4062(b)(1)(A)(I) upon all property and rights to property, whether real or personal, belonging to such person.

The priority of this lien *vis-a-vis* competing claimants against the debtor is then determined in the same manner as a tax lien under § 6326 of the Internal Revenue Code. ERISA Section 4068(c)(1), 29 U.S.C. § 1368(c)(1), states:

> [T]he priority of a lien imposed under subsection (a) shall be determined in the same manner as under section 6323 of the Internal Revenue Code....

As held previously, the PBGC's claims arose pre-petition and existed as a contin-gent claim on the Filing Date [11]. The mere liquidation of such claims post-petition does not and cannot create a lien. Nor does ERISA Section 4068 purport to treat liens and claims interchangeably. The court in *In re Divco Philadelphia Sales Corp.*, 64 B.R. 232, *modified*, 72 B.R. 199 (Bankr.E.D.Pa.1986), *aff'd*, No. 86–6110 (E.D.Pa. 1987) addressed the interplay between ERISA Section 4068(c)(2), 29 U.S.C. § 1368(c)(2), and Code § 507(a)(7). In determining whether the PBGC was subject to the notice provision for tax claims under Bankruptcy Rule 2002(j), the court held:

> [ERISA Section 4068] does not state that the underlying ERISA liability is a tax liability. [ERISA Section 4068] merely provides that an ERISA claim and a tax claim share one feature in common— liens of both share on a par.
>
> It is certainly a leap in faith then to say that because one shares a single trait in common with the other, the two are identical. Applying this logic, one could say that a donkey is the same as an elephant simply because they both have four legs. We accordingly conclude that 29 U.S.C. § 1368 does not render the ERISA claim a tax claim....

*Id.* at 235. Although this holding was later rendered *dictum* by the amended decision in *In re Divco Philadelphia Sales Corp.*, 72 B.R. 199 (Bankr.E.D.Pa.1986), *aff'd*, No. 86–6110 (E.D.Pa.1987), which found ERISA Section 4068 inapplicable since the PBGC's claim was not for termination liability, the court's reasoning still stands.

The PBGC's claims do not constitute "taxes" entitled to priority under § 507(a)(7), nor did its claims ever ripen into liens. First, § 507(a)(7) of the Code carefully enumerates taxes that are entitled to seventh priority. No ERISA claim is included in this detailed list, nor is reference made in the legislative history to any intent of Congress to include any PBGC lien. Second, none of the language in § 507(a)(7) tracks the ERISA Section 4068(c), 29 U.S.C. § 1368(c), "tax due and owing" language. Section 507 was enacted after ERISA. While Congress could have

---

**11.** *See,* discussion of Issue 2 herein.

expressly incorporated in § 507(a)(7) the "tax due and owing" language of ERISA Section 4068(c)(2), it did not.

In contrast, other Code sections, recognize ERISA or track language from ERISA. For example, § 724 of the Code, which details the tax lien priorities to be applied in Chapter 7, clearly tracks the language of ERISA Section 4068(c)(1), 29 U.S.C. § 1368(c)(1). Section 724(d) of the Code provides:

> A statutory lien the priority of which is determined in the same manner as the priority of a tax lien under section 6323 of the Internal Revenue Code of 1954 (26 U.S.C. § 6323) shall be treated under subsection (b) of this section the same as if such lien were a tax lien.

The legislative history explains as follows:

> Subsection (d) specifies that any statutory lien whose priority is determined in the same manner as a tax lien is to be treated as a tax lien under this section, even if the lien does not secure a claim for taxes. An example is the ERISA lien.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 382 (1977); Sen.Rep. No. 95–989, 95th Cong., 2d Sess. 96 (1978), U.S.Code Cong. & Admin.News, pp. 5882, 6338.

Section 507(a) of the Code, unlike § 724(d), does not acknowledge the ERISA lien in any way. Moreover, under § 724 of the Code, the existence of a tax lien can give rise to priority treatment in a Chapter 7 case only if the lien has been perfected pre-petition and is otherwise unavoidable. Nowhere does the Code purport to afford priority or lien status to the holder of a voidable lien.

The PBGC argues that there should be no distinction between a lien or claim in this instance. The PBGC relies on several cases all of which seem to be either *Act* cases or cases where the plans had been terminated pre-petition and therefore a lien perforce created.

In cases arising under the old Bankruptcy Act, certain PBGC claims pursuant to ERISA Section 4068, 29 U.S.C. § 1368, were accorded the same priority as tax liens. *See, e.g., PBGC v. Washington Group*, 8 Employee Benefits Cas. (BNA) 1351 (M.D.N.C.1987); *In re Bollinger Corp.*, No. 76–282, slip op. at 2–3 (Bankr. W.D.Pa.1981). In *Washington Group* and *Bollinger*, the priority issue was resolved under § 64(a) of the old Act, which, in contrast to § 507(a)(7) of the Code, did not describe with particularity taxes entitled to priority. Section 507(a)(7) of the Code was not applicable in those cases. Additionally, the *Washington Group* case wrongly assumes, *inter alia*, that a federal tax lien is enforceable in a bankruptcy case even if it has not been perfected. Thus, *Washington Group* and *Bollinger* do not control the priority issue in the instant cases, because here, resolution of the issue turns on § 507(a)(7) of the Code.

**B.** *Whether Bankruptcy Code § 362 automatically stays the post-petition creation of lien.*

Section 362(a)(4) of the Code stays "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). This section prevents the creation of a post-petition lien. *See, In re North Side Lumber Co.*, 59 B.R. 917 (Bankr.D.Or.1986), *aff'd*, 83 B.R. 735 (9th Cir.B.A.P.1987), and *aff'd*, 865 F.2d 264 (9th Cir.1988); *In re Cummings Mkt., Inc.*, 53 B.R. 224 (Bankr.D.Vt.1985); *In re New England Carpet Co.*, 26 B.R. 934 (Bankr. D.Vt.1983).

■ It is clear that the PBGC's claims never ripened into liens. Before a claim can give rise to a lien under ERISA Section 4068(a), there must be a failure or refusal by the debtor to pay after a demand has been made. 29 U.S.C. § 1368(a). Here, the automatic stay of the Code prevented the PBGC from making a demand and it was therefore impossible for a lien to arise. *See*, 11 U.S.C. §§ 362(a)(1) and (a)(6). Furthermore, the lien did not arise by operation of law upon termination of the plans. Even tax liens are subject to the automatic stay and may not arise post-petition by operation of law. *See, In re Parr Meadows Racing, Assoc.*, 880 F.2d 1540, 1545–46 (2nd Cir.1989). Indeed, the creation of, and any attempt to record or perfect, such a

lien would have been void *ab initio*. *See e.g., In re 48th Street Steakhouse, Inc.,* 835 F.2d 427, 431 (2d Cir.1987), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1989) ("Judge Brozman correctly held that Landlord's termination notice violated the automatic stay ... and was therefore void."); *In re Smith,* 876 F.2d 524, 526 (6th Cir.1989); *Morgan Guaranty Trust Co. of New York v. Am. Savings & Loan Assoc.,* 804 F.2d 1487, 1490 (9th Cir.1986), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *In re Funket,* 27 B.R. 640 (Bankr.M.D.Pa. 1982) (creation of lien post-petition prohibited by § 362 of the Code, and any attempt to create a lien violated the stay and was a nullity); 2 *Collier On Bankruptcy,* § 362.11 (15th ed. 1987) ("actions taken in violation of the stay are void and without effect"). *Contra, Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) ("We are persuaded that the better reasoned rule characterizes acts taken in violation of the automatic stay as voidable rather than void."); *see also, In re Albany Partners, Ltd.,* 749 F.2d 670, 675 (11th Cir.1984); *In re Smith Corset Shops, Inc.,* 696 F.2d 971, 976 (1st Cir.1982); *In re Matthews,* 739 F.2d 249, 252 (7th Cir.1984).

In fact, the PBGC had conceded that "no lien enforceable as a *secured* claim can arise post-petition without court approval." Address by Gary Ford, PBGC General Counsel, On Employee Benefits in Bankruptcy, Delivered to ABA Section of Corporation, Banking, and Business Law (Mar. 23, 1987), 14 Pens.Rep. (BNA) 393, 394 (1987) (emphasis in original). However, the PBGC incorrectly continued by stating that, "[t]he unperfected lien arises as a matter of law with demand and non-payment...." *Id.* In this regard, the PBGC's statement failed to acknowledge that the automatic stay prevents not only post-petition perfection of a lien, but also its post-petition creation. In addition, such a contention was flatly rejected by the Second Circuit in *In re Parr Meadows Racing Assoc., Inc.,* 880 F.2d 1540 (2d Cir.1989). There, the court held that tax liens are subject to the automatic stay and may not arise post-petition "by operation of law". *Id.* at 1545–46. The court ruled that the tax liens did not arise passively, but were the product of "the county's assessment and taxation process, which consists of several 'affirmative acts'" that were subject to the automatic stay. *Id.* at 1545. The Second Circuit noted further:

> [E]ven if it were possible to create and perfect a lien without any action by the county, that lien, attaching to the property postpetition, would still violate the automatic stay.... [The bankruptcy goal of] equitable treatment requires that all creditors, both public and private, be subject to the automatic stay.

*Id. See also, In re Bellman Farms, Inc.,* 86 B.R. 1016 (Bankr.D.S.D.1988) (automatic stay prevented creation or perfection of any property liens, including lien for property taxes); *In re Ballentine Bros., Inc.,* 86 B.R. 198 (Bankr.D.Neb.1988) (post-petition tax lien violated automatic stay); *In re Stack Steel & Supply Co.,* 28 B.R. 151, 155 (Bankr.W.D.Wash.1983) ("Code § 362(a)(4) stays all creditors, including governmental units, from performing acts to perfect liens.... Accordingly, any lien which is claimed ... to have attached *after* the filing of the Chapter 11 petition is void." (emphasis in original)).

Moreover, the PBGC's contention that employer liability in this case was "incurred by the estate" and therefore is a post-petition tax is without merit. The PBGC argues that the employer liability is a "one-time tax" that the employer must pay for termination of an underfunded plan. However, the tortured reasoning of the PBGC's argument is belied by the clear language of the statute itself. In this regard, the PBGC has failed to point to any statutory provision which would lend credence to its "post-petition tax" theory. In addition, this Court has previously concluded that the Debtors liability arose pre-petition and not in the context of a transaction with the Debtors-in-possession[12]. Thus, the PBGC's assertion that employer liability is somehow analogous to capital gains

---

12. *See,* discussion of Issue 2 herein.

taxes imposed on the estate is wholly misplaced.

The PBGC also advances *dictum* in *PBGC v. Ouimet Corp.*, 470 F.Supp. 945, 953 n. 19 (D.Mass.1979), *aff'd*, 630 F.2d 4 (1st Cir.1980), *cert. denied*, 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981), a Bankruptcy Act case, as support for the proposition that its Insufficiency Claims are to be given priority status. However, in the *Ouimet* case, the pension plan was terminated before the bankruptcy filing. Therefore, a pre-petition lien arose, which was afforded priority status under ERISA Section 4068.

Moreover, the other cases on which the PBGC relies are anomalies. *PBGC v. Washington Group*, 8 Employee Benefits Cas. (BNA) 1351 (M.D.N.C.1987) is a confusing decision rendered in the context of a Bankruptcy Act Chapter X case in which the court fails to notice that the debtor is mistakenly raising arguments under the Code and fails to distinguish between a claim and a lien. Contrary to the Second Circuit decision in *Parr Meadows*, 880 F.2d at 1545–56, the court proceeds from the assumption that tax liens are effective in bankruptcy cases even if unperfected; fails to state what type of priority it is affording to the PBGC's claim; and never cites the priority sections for either the Bankruptcy Act or the Code. *In re Bollinger Corp.*, No. 76–282, slip op. at 3–4, on which the PBGC also relies, is another Bankruptcy Act case and is dependent on the court's reading of the language of § 64(a)(4) of the Bankruptcy Act, which language is not in the Code.

The PBGC mistakenly contends that "Congress plainly did not contemplate that perfection would be required in ... [the Title 11] context" in order to give effect to a PBGC lien. (PBGC's Memorandum of Law at 31.) Sections 724(a) and (d) of the Code, taken together, provide that a PBGC lien is to be treated as a tax lien for purposes of § 724(b), and § 724(b) expressly states that the PBGC is entitled to priority with respect to the proceeds of the property subject to the lien *only* if the lien is not avoidable under the Code. The PBGC has pointed to no provision of the Code excluding its unperfected liens from avoidance, either in the Chapter 7 or Chapter 11 context, because there are none and Congress did not intend any.

█ Finally, even if a lien could have arisen, it would be avoidable under § 545 of the Code which allows the trustee or debtor-in-possession to avoid statutory liens that are "not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser ... whether or not such a purchaser exists...." 11 U.S.C. § 545. Thus, even if a lien, albeit unperfected, had arisen notwithstanding the automatic stay, the lien would be avoidable under § 545 of the Code, since it purports to secure a pre-petition claim that was neither perfected nor enforceable at the time of the bankruptcy filings. *See*, 1 *Collier on Bankruptcy* ¶ 5.21[1][c] (15th ed. 1988).

In accordance with the foregoing discussion, this Court concludes that the post-petition termination of the pension plans did not give rise to claims entitled to priority tax status pursuant to § 507(a)(7) of the Code or lien status pursuant to ERISA Section 4068, 29 U.S.C. § 1368. Consequently, the PBGC's claims must therefore be reclassified as general unsecured claims.

4. Whether the PBGC's Insufficiency Claims should be disallowed to the extent that they exceed the seventy-five percent statutory limit or are duplicative of the PBGC's contribution claims.

The Plaintiffs assert that the PBGC's Insufficiency Claims, which exceed $2.2 billion, are vastly overstated because the PBGC fails to give effect to ERISA's seventy-five percent limit on its recovery and because its numerous claims are duplicative and overlapping.

### A. *Seventy–Five Percent Limit*

Under ERISA Section 4062(b)(1), the PBGC's employer liability claims include the total amount of the unfunded guaranteed benefits under a plan, unless net

worth is a limiting factor.[13] If it is determined that net worth is limiting, the employer liability is reduced to the greater of (a) 30% of the collective net worth of the employer and its controlled group, or (b) 75% of the total amount of unfunded guaranteed benefits. If an employer claims that 30% of the collective net worth of it and its controlled group is less than the plan asset insufficiency, the employer must submit to the PBGC within 120 days after the establishment of the plan termination date its net worth estimate and certain information related to that estimate. 29 C.F.R. § 2622.6(a). ERISA then delegates to the PBGC the authority to make an administrative determination of the net worth of the plan sponsor and the other members of its controlled group. ERISA Section 4062(d)(1)(B) and (C), 29 U.S.C. § 1362(d)(1)(B), (C). *See generally*, 29 C.F.R. pt. 2622 (1987).

The PBGC contends that LTV asserted the net worth limitation as to three of the four plans, but failed to submit estimates of the net worth of LTV Steel and its controlled group members and failed to support its assertion by submitting the information required by PBGC's regulations. Thus, the PBGC maintains that it properly filed Section 4062(b)(1) claims on behalf of each of the four Terminated Plans for the total amount of unfunded guaranteed benefits.

In contrast, Plaintiffs state that there is nothing in ERISA Section 4062(b) which requires that the net worth limitation be raised as an affirmative defense or be waived. Thus, Plaintiffs maintain that in calculating its claims, the PBGC has failed to give effect to this limit and therefore the claims must be reduced to reflect ERISA Section 4062(b), 29 U.S.C. § 1362(b).

At the hearing, counsel to the PBGC stated as follows:

> If LTV truly believes that net worth is limiting in this case, then it ought to give us that information as soon as possible so that we can complete the administrative process and adjust the claim accordingly.

Transcript at 68. Therefore, the PBGC obviously concedes that it must give effect to this limit, if applicable, and recalculate its claims accordingly. However, since the PBGC has not as of yet made a net worth calculation, Plaintiffs' request for a declaration in anticipation of a possible dispute regarding the agency's net worth determination is premature. Consequently, it is not necessary for this Court to address whether it is within its purview to determine for itself the net worth of the plan sponsor and the other members of its controlled group in the context of determining the allowability of the PBGC's claims against the estate.

B. *Disallowance of Duplicative Insufficiency Claims.*

■ Plaintiffs assert that the PBGC's Insufficiency Claims for each plan are determined on the basis of the amount by which the present value of the guaranteed benefits of the plan exceeds the value of the assets of the plan. In the case of each of the plans, a substantial portion of that Insufficiency Claim is attributable to the fact that the plan has not yet realized any recovery on one of its major assets, the plan's claims for unpaid contributions (which are being asserted by the PBGC, as successor plan trustee). Thus, the Plaintiffs argue that for each dollar of unpaid contribution owing to each plan, the PBGC is asserting claims totalling at least two dollars: (a) the PBGC, in its individual ca-

---

**13.** ERISA Section 4062(b) provides that a contributing sponsor and its controlled group are liable to the PBGC for the sum of
   (i) the lesser of—
   (I) the total amount of unfunded guaranteed benefits (as of the termination date) of all participants and beneficiaries under the plan, or
   (II) 30 percent of the collective net worth of all persons [in the controlled group], and

   (ii) the excess (if any) of—
   (I) 75 percent of the amount described in clause (i)(I), over
   (II) the amount described in clause (i)(II), together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the [PBGC].

pacity, is asserting a one dollar claim for such dollar of unpaid contribution as creating a plan asset insufficiency, and (b) the PBGC, in its capacity as successor plan trustee, is asserting another one dollar claim for the same dollar of unpaid contributions as a contribution claim. Thus, Plaintiffs argue that this Court should disallow any amounts which would otherwise be allowed in these cases as Insufficiency Claims to the extent that duplicative unpaid contribution claims of each plan are allowed.

In contrast, the PBGC argues that these claims are not duplicative in nature and that they are estimates that will be adjusted for the value of contribution claims if and when appropriate.

Allowing the PBGC two dollars of claims against the same Debtor for one dollar of loss violates the principles of equality of distribution and uniformity of treatment of creditors that are fundamental to the Code. To the extent that the unpaid contribution claims of each plan are allowed in any of the LTV Chapter 11 cases, any amounts which would otherwise be allowed in these cases as Insufficiency Claims must be disallowed as duplicative.

5. Whether the PBGC's pre-petition contribution claims with § 507(a)(4) priority must be offset by payments made by the Debtors.

The PBGC has filed claims in excess of $107 million as trustee for the Terminated Plans for unpaid contributions allegedly entitled to the priority conferred by § 507(a)(4) of the Code, attributable to services rendered during the 180 days before the Filing Date. Plaintiffs contend that the § 507(a)(4) priority conferred by the Code limits the PBGC's entitlement to any priority treatment of its claims for unpaid contributions for services rendered within the 180 days of the filing; sets a maximum limitation on amount of the claims; and requires that the claims be offset by wages and other benefits payments already made in respect of the §§ 507(a)(3) and (a)(4) priorities. Consequently, Plaintiffs state that the result in these cases will be that the

PBGC's contribution claims qualifying for § 507(a)(4) priority will be reclassified in their entirety as general unsecured claims. In contrast, the PBGC states that this issue is not ripe for determination because all claims entitled to priority under § 507(a)(4) must share *pro rata* in the payment allocated to that category under a plan of reorganization (assuming anything is available after payment of the § 507(a)(3) claims) and all of those claims have not yet been allowed in these cases.

Section 507(a)(4) provides a priority for a claim which arises only "from services rendered within 180 days before the date of the filing of the petition...." 11 U.S.C. § 507(a)(4) (1988). To the extent that the PBGC asserts claims that arose outside the 180 day service period described in § 507(a)(4) of the Code, its claims clearly must be reclassified as general unsecured claims. *See, e.g., In re Robinson Truck Line, Inc.,* 47 B.R. 631, 636 (Bankr.N.D. Miss.1985); *see also, In re Saco Local Dev. Corp.,* 23 B.R. 644, 648 (Bankr.D.Me.1982), *aff'd,* 711 F.2d 441 (1st Cir.1983).

Section 507(a)(4) further limits the amount of the priority to be accorded under §§ 507(a)(3) and (a)(4) to $2,000 per employee. Thus, under § 507(a)(4)(B)(i), the maximum amount that the PBGC may recover on behalf of each Terminated Plan is determined by multiplying the number of participants in each plan by $2,000.

Pursuant to order of this Court, the Debtors have made numerous payment in respect of the priorities provided under §§ 507(a)(3) and (a)(4). The legislative history of § 507(a)(4) makes clear that Congress intended to provide a priority, in addition to the wage priority of § 507(a)(3), for "fringe benefits" that represented new forms of compensation to union or non-union employees, such as life, health and disability insurance, union-operated welfare and annuity funds, or other fringe benefits. H.R.Rep. No. 595, 95th Cong., 1st Sess. 357, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6313 ("The bill recognizes the realties of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are

substituted"); S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978). Courts interpreting this provision have taken an expansive view with respect to the types of payments that deserve priority status under § 507(a)(4) of the Code. *See e.g., In re Saco Local Dev. Corp.*, 711 F.2d at 449; *In re Jet Florida Systems, Inc.*, 80 B.R. 544, 548 (Bankr.S.D. Fla.1987); *In re Robinson Truck Line, Inc.*, 47 B.R. at 638.

Plaintiffs do not seek now an evaluation of the amount of allowable priority under § 507(a)(4) of the Code applicable to the PBGC's claim. Clearly that is a question of fact to be decided later at an appropriate time in these proceedings. Plaintiffs' motion merely concerns the status, not the amount, of the PBGC's claims. The PBGC concedes that the aggregate amount paid to those participants under § 507(a)(3) reduces the maximum amount that it may recover under § 507(a)(4). Consequently, the PBGC's claims allegedly entitled to § 507(a)(4) status must be reduced by the amount of the claims already paid to the employees directly. As the PBGC recognizes, allowance of the PBGC's § 507(a)(4) claims in due time will "require[ ] nothing more than a simple mathematical computation." Transcript at 75.

Although clearly a question of fact, it appears in these cases that as a result of the Debtors' payments, these PBGC claims must be reclassified as general unsecured claims in their entirety. It should be noted, however, that the Debtors are not entitled to offset for amounts paid under § 507(a)(3) of the Code to employees who are not participants in the Terminated Plans, nor is the PBGC entitled to claim priority based upon calculation of the priority claims of all employees of LTV because these pension claims are attributable only to claims of LTV Steel employees. Additionally, claims under § 507(a)(4) of the Code asserted against Debtors, other than LTV Steel, that were not the direct employers of the employees at issue, must be expunged because there is no authority in the Code which allows these priorities to apply against non-employers.

6. Whether the PBGC has any basis for asserting Section 4049 Trust Claims.

Section 4049 of ERISA, 29 U.S.C. § 1349, requires the PBGC to establish a trust for the benefit of participants in certain terminated plans. This trust must be used exclusively to receive the liability arising under ERISA Section 4062(c); to make distributions to eligible participants; and to defray the reasonable administrative expenses of the trust. 29 U.S.C. § 1349(a). The statute requires the PBGC to serve as administrative trustee of the trust, except where it determines that it will be cost-effective to designate a fiduciary to serve in that capacity. 29 U.S.C. § 1349(b)(1)(B). In 1986 Congress enacted amendments to ERISA which provide that after a pension plan is terminated, the PBGC "shall" appoint a Section 4049 trustee for purposes of "conducting negotiations and assessing and collecting liability pursuant to Section 4062(c) [of ERISA]." ERISA Section 4049(b)(1)(a), 29 U.S.C. § 1349(b)(1)(A). Once appointed, the Section 4049 trustee is subject to the general fiduciary duties of an ERISA fiduciary, as defined in ERISA Section 3(21), and is directed in particular to assess payments against liable employers "on commercially reasonable terms" for the benefit of retirees. ERISA Section 4062, 29 U.S.C. § 1362. Congress authorized the Section 4049 trustee to collect up to seventy-five percent of nonguaranteed benefit amounts in excess of the PBGC's guaranteed benefits. ERISA Section 4049, 29 U.S.C. § 1349.

The PBGC has filed proofs of claim for liabilities aggregating over $289 million on behalf of an ERISA Section 4049 trust. Plaintiffs assert that these claims must be expunged because (i) no Section 4049 trustee has ever been appointed for any of the four terminated plans, and (ii) the PBGC has no standing to assert claims on behalf of any Section 4049 trust. In the alternative, Plaintiffs also contend that any claim based upon ERISA Section 4049 must be reduced to the extent offset by payments made to employees or retirees in respect of other claims for benefits.

The PBGC argues that contrary to Plaintiffs' assertions, Section 4049 provides clear authority for the PBGC to assert claims on behalf of the Section 4049 trusts. The PBGC further asserts that because the status of three of the four Terminated Plans was uncertain, it would be premature and wasteful to appoint such a trustee at this time until the Supreme Court renders its decision on the restoration issue. The PBGC therefore concludes that in order to preserve the claims of the Section 4049 trusts, the PBGC, in its capacity as administrative trustee, filed contingent claims on behalf of the unborn trusts.

■ Here, no trust has been created and no trustee appointed. Essentially, the PBGC has filed claims on behalf of a non-existing entity. The PBGC's "premature and wasteful" assertion as to why it has failed to appoint a Section 4049 trustee is disingenuous at best since one plan which was terminated in September, 1986, is not part of the restoration issue before the Supreme Court, and the other three plans were terminated in January 1987.

Even if a trust had been created, only a trustee or a beneficiary of the trust would have standing to file a claim on behalf of the trust. *See*, IIA A. Scott, *The Law of Trusts* § 177 (4th ed. 1987) ("A trustee is under a duty to the beneficiaries to take reasonable steps to realize on claims he holds in trust"); *id.* at § 282.1 ("If the trustee improperly refuses to bring an action against a third person.... [t]he beneficiaries can maintain a suit in equity against the trustee to compel him to do his duty and to bring the proper action against the third person ... in order to avoid multiplicity of suits the beneficiaries were permitted to join the third person as a co-defendant with the trustee ..."); *see also*, Restatement (Second) of Trusts §§ 280–82 (1959). It is undisputed that the PBGC is neither trustee nor beneficiary with respect to collecting non-guaranteed benefits [14]. Thus, this Court finds that the PBGC's Section 4049 Trust Claims must be expunged.

■ Even assuming, *arguendo*, that the Section 4049 Trust Claims have been filed appropriately, they must be reduced to the extent they are offset by payments made to employees or retirees pursuant to this Court's Wage Order and subsequent amendments and the 1987 Interim Labor Agreement and companion agreements. Plaintiffs agree that even for the one plan which is not subject to the PBGC's restoration notice, it would be a waste to appoint a trustee at this time because it has paid directly to current retirees amounts equivalent to a portion of non-guaranteed benefits for which the Section 4049 Trust Claims are asserted. In fact, the Plaintiffs assert that a Section 4049 trustee would have collected for distribution for retirees *less* than the amounts LTV Steel has already paid to current retirees. The Section 4049 trustee collects for distribution to retirees only seventy-five percent of non-guaranteed benefits. ERISA Section 4049, 29 U.S.C. § 1349. The courts of this Circuit and District have already found that LTV Steel is obligated to pay, and has paid, amounts on average exceeding ninety-two percent of the benefits for current retirees. *See, In re Chateaugay Corp.*, 87 Bankr. 779, 789–91 (S.D.N.Y.1988), *aff'd sub nom.*, *PBGC v. LTV Corp.*, 875 F.2d 1008 (2nd 1989). Since LTV Steel's retirees are being paid more than they would through payments from a Section 4049 trust, the PBGC's claims must be offset and consequently expunged.

The PBGC's argument that the Section 4049 trusts are independent legal entitles, with independent statutory claims and therefore, neither LTV nor its labor unions have the standing or the authority to compromise those claims is unpersuasive. Under these circumstances no compromise is necessary. The claims are being satisfied by payment to the plan beneficiaries of equivalent benefits. If there are individuals who would benefit more from the Section 4049 Trust Claims than they would from the payments made by the Debtors from the replacement plans, then any discrepancies can be accommodated in an ac-

---

**14.** The issue as to whether a § 4049 trustee, when and if actually ever appointed, may prop-erly assert claims against these Debtors' estates is not currently before this Court.

counting. However, principles of equality of distribution and uniformity of treatment of creditors in bankruptcy do not permit double recovery from the same Debtor on these claims.

## CONCLUSION

To summarize the foregoing discussion, this Court concludes as follows:

(1) federal bankruptcy law, not ERISA, is determinative of the discount rate to be applied in calculating the present value of the PBGC's claims;

(2) the post-petition termination of the pension plans did *not* give rise to (i) post-petition claims, (ii) claims entitled to administrative priority pursuant to § 503(b)(1)(A), (iii) claims entitled to priority tax status pursuant to § 507(a)(7) of the Code, or (iv) claims entitled to lien status pursuant to ERISA Section 4048, 29 U.S.C. § 1368;

(3) the PBGC must give effect to the limits imposed by ERISA Section 4062(b), 29 U.S.C. § 1362(b), if applicable, and recalculate its claims accordingly;

(4) the PBGC's Section 4049 Trust Claims must be expunged; and

(5) the PBGC is only entitled to a single, nonduplicative recovery.

Consequently, Plaintiff's motion for partial summary judgment is granted and the PBGC's cross-motion is denied.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1) and Bankruptcy Rule 9033.